UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ASHAKI PASCHALL and | ) | |
| GERALD RAGLAND, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-04488-JMS-MG |
| | ) | |
| TUBE PROCESSING CORP., | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiffs Ashaki Paschall and Gerald Ragland bring this action against their former employer, Tube Processing Corp. ("Tube Processing").  Ms. Paschall alleges that she was subjected to a hostile work environment based on her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq*, and based on her race, in violation of Title VII and 42 U.S.C. § 1981.  Mr. Ragland alleges that he was subjected to a hostile work environment based on his race, in violation of Title VII and § 1981.  Tube Processing has filed a Motion for Summary Judgment, [Filing No. 35], which is now ripe for the Court's review.

## I.
### STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited

1

do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record

2

for evidence that is potentially relevant to the summary judgment motion before them."
*Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved
against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

At the outset, the Court notes that Plaintiffs failed to comply with this Court's Practices
and Procedures for citing to record evidence in their response brief.  The Practices and
Procedures provide: "It is critically important that exhibits be filed before supporting briefs so
that citations in supporting briefs are to the docket numbers of the previously-filed exhibits.  This
significantly facilitates the Court's review of the motion and briefs as well as the parties' review
of the filed materials."  [Filing No. 5 at 3.]  In addition, "[i]n a supporting brief, [parties must]
cite to the docket number, the attachment number (if any), and the applicable .pdf page as it
appears on the docket information located at the top of the filed document."  [Filing No. 5 at 4.]
Plaintiffs' citations do not follow this format, and instead reference the documents' titles, such as
"Plaintiffs' Exhibit 1: Declaration of Ashaki Paschall, ¶ 4."  The proper citation for this material
is "Filing No. 44-1 at 1."  In addition, Plaintiffs' citations to depositions appear to use the page
numbers printed on the deposition transcripts, rather than the page numbers included in the
docket information at the top of the filed documents.  [*See, e.g.*, Filing No. 43 at 6 (citing
"Defendant Exhibit 7, p. 8" for deposition testimony that appears in Filing No. 36-7 at 2).]
These failures to follow the proper citation conventions have made the Court's review of the
record evidence unnecessarily difficult and cumbersome.

Plaintiffs' improper citations likely also contributed to Tube Processing's argument, raised
in its reply brief, that Plaintiffs failed to comply with Local Rule 56-1(e) by citing to a certain
deposition and its exhibits "as a whole" rather than providing specific citations to the record.

[*See* Filing No. 48 at 10.]  Again, Plaintiffs cited to "Young Dep. Ex. 5"—which apparently was interpreted by Tube Processing to be a citation to an entire deposition—instead of using the proper citation to Filing No. 44-8, which is a two-page printout of an email conversation.  [*See* Filing No. 44-8; Filing No. 49 at 5-6 (Plaintiffs' surreply brief explaining the citation).]  Although the Court concludes that Plaintiffs' citations are not so deficient as to warrant disregarding the factual assertions related to the exhibit to Sidney Young's deposition, Plaintiffs' counsel is cautioned to follow the Court's Practices and Procedures in this and other cases going forward.

Turing to the facts themselves, the following factual background is set forth pursuant to the standards detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A.  The Parties and Other Relevant Individuals**

Tube Processing is a commercial and aerospace manufacturing company that operates its commercial tube processing facility ("CTP facility") in Indianapolis, Indiana.  [Filing No. 36-1 at 2.]  In 2018, the CTP facility had over 400 employees, including temporary employees.  [Filing No. 36-1 at 2.]  During the time period relevant to this lawsuit, the CTP facility occupied two buildings, one located on Madison Avenue ("the Madison Building") and on located on Shelby Street ("the Shelby Building").  [Filing No. 36-1 at 2-3.]

The Shelby Building housed several departments, including brazing, welding, inventory, and shipping.  [Filing No. 36-1 at 3.]  Sidney Young, the Assistant Vice President of Human

Resources for Tube Processing, had an office in the Shelby Building.  [Filing No. 36-1 at 1; Filing No. 36-1 at 3.]

The Madison Building also housed several departments, including end forming and bending.  [Filing No. 36-1 at 3; Filing No. 36-5 at 2.]  Steve Lang was the supervisor of the Madison Building.  [Filing No. 36-1 at 4.] Joshua Combs was the first shift group leader in the end forming/bending department and reported directly to Mr. Lang.  [Filing No. 36-3 at 2; Filing No. 36-3 at 4.]  As the team leader, Mr. Combs was responsible for assigning work to employees in the department based on production priority and employees' skill sets.  [Filing No. 36-3 at 4.] Mr. Combs was not involved in hiring or firing anyone, but would report any issues to Mr. Lang. [Filing No. 36-3 at 4-5.]

Ms. Paschall is a Black woman.  [Filing No. 44-1 at 1.]  In 2018, she was hired through a temporary staffing agency to work as a machine operator in the end forming/bending department within the Madison Building.  [Filing No. 36-2 at 3; Filing No. 36-2 at 10-11.]  She worked there from September 4, 2018 to October 29, 2018.  [Filing No. 36-2 at 4.]  Ms. Paschall sometimes went by the first name Dawn and is referred to by that name in some of the deposition testimony and other relevant documents.  [*See* Filing No. 36-3 at 4; Filing No. 36-4 at 2; Filing No. 36-5 at 8.]

Mr. Ragland is a Black man.  [Filing No. 44-2 at 1.]  He was hired at Tube Processing through a temporary staffing agency in 2016, and was hired on directly as a permanent employee approximately eight months later.  [Filing No. 44-2 at 1.]  In 2018, he worked first shift as a machine operator in the end forming/bending department.  [Filing No. 44-2 at 1.] Mr. Ragland's employment with Tube Processing ended in late November 2018.  [Filing No. 44-2 at 2.]

During the timeframe relevant to this lawsuit, Barb Odom, a white woman, John Benash, a white man, and Benjamin Sanders, a Black man, also worked as machine operators in the end forming/bending department. [Filing No. 36-4 at 2-4; Filing No. 36-5 at 2-3; Filing No. 36-5 at 6; Filing No. 44-1 at 1.]  Ms. Odom was involved in training both Mr. Ragland and Ms. Paschall. [Filing No. 36-2 at 10; Filing No. 36-5 at 11-12; Filing No. 36-5 at 19.]  In addition, Mr. Benash provided some training to Ms. Paschall.   [Filing No. 36-2 at 6-7.]  According to Ms. Paschall, both Ms. Odom and Mr. Benash "held themselves out as lead employees with authority over [her]."  [Filing No. 44-1 at 1; *see also* Filing No. 36-2 at 3 (Ms. Paschall testifying in her deposition that she believed that Ms. Odom and Mr. Benash were "lead" employees with equal authority to Mr. Combs).]   However, Ms. Odom testified that although she was involved in training employees and telling them what needed to be done, she was not anyone's "boss" and Mr. Combs was in charge.  [Filing No. 36-5 at 10-11.]  Mr. Ragland testified that Mr. Benash was not a supervisor.  [*See* Filing No. 36-3 at 35 (Q: Now Benash is not a supervisor; right?  A: He ain't nothing.").]

### B. Ms. Paschall's Interactions with Mr. Benash

During Ms. Paschall's first few days on the job, she was being trained by Mr. Benash. [Filing No. 36-2 at 6-7.]  In her deposition, she described her interaction with him as follows:

> When I was supposed to be getting trained by [Mr. Benash], I went to Josh [Combs] and I told him I can't get trained because that's all he wants to talk about is Mario Andretti, whoever the Andretti lady is, and cars.  Then after probably about two or three days of that, it went into, "Do you get wet, how does it look." And then he got into telling me about his jacuzzi he just had built in his house. And I was just like – I went over to Josh, and I was like, "I can't work with him."

[Filing No. 36-2 at 6.]  Ms. Paschall testified that Mr. Benash's comments about Mario Andretti and a female racecar driver were distracting from her training but not "out of place."  [Filing No. 36-2 at 7.]  Counsel and Ms. Paschall then had the following exchange:

**Q**: I gotcha.  And then you said he asked you, "Do you get wet"?

**A**: (Nods head.)

**Q**: What did he mean by that?

**A**: Do I swerve, was his exact words.  And it's basically do -- you know, do you -- do you get wet when you have sex? He wanted to know if black women got wet, and were we -- I mean, to me, I took it as he was asking me do black women get wet just like white women get wet too, you know? I'm assuming, you know, that's what --

**Q**: Now, was that the first inappropriate sexual comment he made to you?

**A**: That was the first one.

**Q**: All right.  So right then, that should have been an indication that something's very wrong, if someone would say that to you not even having known them for a few days.

**A**: Right.

**Q**: And how did you respond to that?

**A**: I went and got Josh.

**Q**: So did you do it immediately, or…

**A**: Yes.

**Q**: But it sounds like -- well, it sounds like he also said something about how does it look?

**A**: He did.  He said that, too.  He said, "How does it look."  This was all in one day, and it got to the point where I just -- I couldn't take it no more.  I had just started, so I was trying not to complain.  I like -- I wanted the job.

[Filing No. 36-2 at 7.]

Mr. Combs remembers Ms. Paschall being upset and "crying almost hysterically" following this incident, so he told her to go to the bathroom to wash her face.  [Filing No. 36-3 at 14.]  Ms. Paschall testified that Mr. Combs assigned her to a different job, away from Mr. Benash, for the rest of the day.  [Filing No. 36-2 at 7-8.] Then, "like the next day or so," she was assigned to work at a machine near Mr. Benash, and "he was just throwing things, and he was like in a bad mood."  [Filing No. 36-2 at 8.]  He did not speak to her at all that day, nor did he make any inappropriate comments to her on any other occasion.  [Filing No. 36-2 at 8-9; *see also* Filing No. 36-2 at 9-10 (Ms. Paschall stating, in response to a question about whether she had

any further problems with Mr. Benash, "No.  Not about the sex.  Now, as far as him just running his mouth, yes, I still had to deal with that.").]

Ms. Paschall also testified that on a separate occasion, when she completed a job quickly, she overheard Mr. Benash say to another employee "ooh that n**ga be working fast."  [Filing No. 36-2 at 12.]  Ms. Paschall stated that Mr. Benash was not speaking directly to her, but she believed he was speaking about her.  [Filing No. 36-2 at 12.]  She testified that she reported the comment to Mr. Combs.  [Filing No. 36-2 at 12.]

In her declaration submitted in support of her response to Tube Processing's Summary Judgment Motion, Ms. Paschall gives the following account of her encounters with Mr. Benash:

> 9. Shortly after I started working at Tube Processing, while training with Benash, he asked me if "I squirted" during sex and asked how my vagina looked since I was Black and he was white.
>
> 10. I was trying not to cause a stir since I had just started, but I became upset and complained immediately to Josh Combs, another lead employee in my department.
>
> . . .
>
> 12. The next day Benash worked next to me, but was not training me, and Benash was angry and throwing things in his area.
>
> . . .
>
> 15. I also heard Benash say, referring to me, to another lead employee, "Ooh that n**ga be working fast."
>
> 16. I told Josh Combs that same day that Benash was calling black employees "n**gers."

[Filing No. 44-1 at 1-2.]

In a recorded conversation between Ms. Paschall and Mr. Young that took place on October 25, 2018, Mr. Young acknowledged the complaint about Mr. Benash, but noted that Mr. Benash was out of work for an injury and Mr. Young would "deal with that issue when he comes

back." [Filing No. 36-7 at 2; *see also* Filing No. 36-2 at 20.] Mr. Young also said that he "can see both sides of the issue" and that he had never had any complaints about Mr. Benash "involving racism or anything like that." [Filing No. 36-7 at 3.]

During that same recorded conversation, Ms. Paschall addressed Mr. Ragland's complaints of discrimination, stating:

> . . . and then with Gerald, I just -- I -- it -- I love him to death, you know what I'm sayin', but . . . it is what it is. Like he's just -- he's different, . . . I told him to go to the doctor and give Sid and them your paper so that they know what's wrong with you so they don't think -- because you're like -- you up and down one day. You know, one day you're happy, and the next day, they're racists, they won't let me do this, yada, yada, yada.
> What happened to me really happened, you know. Like I don't know every day what they're doin' to you because all you got to do is just stay out they face. That's what I do.

[Filing No. 36-7 at 5.]

### C.  Mr. Ragland's Interactions with Mr. Benash

Mr. Ragland characterized Mr. Benash's behavior as "hostile" and "confrontational." [Filing No. 44-2 at 2.] Mr. Ragland testified that "a couple different people" "got into it" with Mr. Benash. [Filing No. 36-6 at 8-9.] Mr. Ragland stated that Mr. Benash "got up into [his] face," but Mr. Ragland did not know why. [Filing No. 36-6 at 9.] Mr. Ragland reported the incident to Mr. Lang and Mr. Young, but according to Mr. Ragland, management did not do anything about the incident because "they let stuff slide." [Filing No. 36-6 at 9.] However, Mr. Ragland was written up for making threats to handle the issue with Mr. Benash outside of work. [Filing No. 36-6 at 9; Filing No. 36-6 at 94.]

### D.  Other Employees' Interactions with Mr. Benash

Other employees have complained about their interactions with Mr. Benash. According to Mr. Combs, Luke Samples, a white machine operator, complained that Mr. Benash "was

picking on him." [Filing No. 36-3 at 6.]  Mr. Combs explained that Mr. Benash is "a very direct person" and "very loud," and Mr. Samples complained about how Mr. Benash talked to him. [Filing No. 36-3 at 6.]  Mr. Combs testified that he received similar complaints from Mr. Ragland, who also believed that Mr. Benash was loud and would pick on people.  [Filing No. 36-3 at 6.]  Mr. Combs also recalled that Ms. Paschall and Ms. Odom had complained about Mr. Benash, noting that "[p]retty much every employee had the same complaint." [Filing No. 36-3 at 6.]  Mr. Combs often reprimanded Mr. Benash for his conduct.  [Filing No. 36-3 at 6.]  Ms. Odom testified that Mr. Benash "just liked to try to cause chaos" and was frequently "trying to start issues with people." [Filing No. 36-5 at 13.]

Mr. Young also recalled that people in the end forming department had complained about Mr. Benash's "verbal harassment or treatment of them as far as . . . being generally disagreeable," including Ms. Paschall, Mr. Ragland, and Ms. Odom.  [Filing No. 36-1 at 6.]  According to Mr. Young, management warned Mr. Benash to "keep his mouth shut and talk about work only." [Filing No. 36-1 at 6.]  Mr. Benash was written up on September 20, 2018 for having "altercations or disagreements with co-workers," and the write-up stated "[w]e expect you to change your approach but if not, further disciplinary actions could result." [Filing No. 36-1 at 19.]

### E.  Ms. Paschall's Interactions with Ms. Odom

Ms. Paschall testified that she had a conversation with Ms. Odom, during which Ms. Odom was explaining that she and her mom lived in Decatur.  [Filing No. 36-2 at 10.] According to Ms. Paschall, Ms. Odom said that she and her mom eventually sold their house in Decatur because "they bussed you guys out there." [Filing No. 36-2 at 10; Filing No. 44-1 at 2.]

Ms. Paschall understood that comment to mean that Ms. Odom left Decatur because the city integrated its schools.  [Filing No. 44-1 at 2.]

Ms. Paschall testified that on another occasion, Ms. Odom asked Ms. Pachall if she had ever had "chocolate covered n**ger toes."  [Filing No. 36-2 at 11; *see also* Filing No. 44-1 at 2 (Ms. Ragland stating in her declaration that Ms. Odom stated "she had a taste for 'n**ger toes'").] Ms. Paschall did not know what that term meant, so she excused herself and went into the bathroom to Google it on her phone.  [Filing No. 36-2 at 11.]  She learned that it is a slang term for Brazilian nuts, and the term was coined "because slaves didn't have shoes, [their] feet looked like corn because [they weren't] allowed to have shoes."  [Filing No. 36-2 at 11.]  Ms. Paschall stated in her declaration that she believed Ms. Odom "was calling her a n**ger at first, but she said, no she was talking about a candy she liked."  [Filing No. 44-1 at 2.]  Ms. Paschall "felt like [Ms. Odom] was trying to find a clever way of saying 'n**ger' in front of [her] and it upset [her]."  [Filing No. 44-1 at 3.]

Ms. Odom tells a different version of this encounter, and described the conversation as follows in her deposition:

> [Ms. Paschall] said, "Do you bake?"
> And I said, "Yeah.  What are you making?"
> And she said, "Well, have you ever heard of the term 'white'?"
> And I said, "No.  What is that?"
> And she said, "It's white chocolate or yogurt covered raisins."
> And I said, "Well, that ain't nothing."  I said, "That's -- I think that's something that's kind of normal, because down South, my grandmother calls chocolate covered cream drops 'blank toes,'" and I said -- but I didn't say "blank toes."  And then I said, "It's also called a nut."
> And then I didn't feel comfortable with that conversation no more, so I just tried to, you know, [walk] away, get away from her, and I just got away from her.  I felt she was okay then, and just kind of watched her from a distance.

[Filing No. 36-5 at 15-16.] Later in her deposition, Ms. Odom clarified that Ms. Paschall used the term "white n\*\*ger" and Ms. Odom used the term "n\*\*ger toes" instead of "white" and "blank toes." [Filing No. 36-5 at 19.]

Ms. Paschall reported the incident to Mr. Combs, who in turn reported it to Mr. Lang and Mr. Young. [Filing No. 36-2 at 11; Filing No. 36-3 at 17.] On October 2, 2018, Mr. Young sent an email about the incident to Mr. Lang; Mike Gill, the Vice President/General Manager; and Tracy Gerth, the Vice President of Human Resources. [Filing No. 36-1 at 2; Filing No. 36-1 at 4; Filing No. 36-1 at 21-22.] The email read:

> On 9/21 or 22, Barbara Odom made a comment to Dawn Paschall (Black Female) about wanting to get a snack called N\*\*ger Toes. Dawn took offense to the use of these words to describe Brazil nuts with reference to black people's toes. This term is a fairly common term used back a generation or two in the South but this is not the first time Barb has used it in our facility. She was told by Steve and Chris not to use terms that are offensive and could become an EEO issue back in 2011 and Steve documented it in an email. No formal warning was given at that time.
>
> Our issue is how to address her repeat behavior given the fact that several senior employees including minorities have made it known she has said this before. The term used in this case, on its face, refers to an item from nature but describes it using an offensive word that has no place in our facility. Evidently, we didn't impress on Barbara the severity of using this word back in 2011 or she isn't able or willing to change her behavior. Our decision on how to address this is critical to set a precedence for future events of this nature. One of the people I talked to yesterday went so far as to say that we might lose people and set future minorities up for same terms if we don't address it harsh enough. Each of the 3 were surprised that she was still using this term and wasn't showing any remorse or understanding of the sensitivity of using the N word.
>
> We are faced with either Final Warning with Suspension or termination. A transfer to another job at Shelby with the warning is possible to remove her from the environment at Madison. Please weigh in at your earliest convenience.

[Filing No. 36-1 at 21-22.] Mr. Lang wrote the following response:

> After reviewing her employee folder, I see the following since 2008 – 10 write-ups for performance issues, 7 evaluation reschedules for efficiency issues, and 2 documented conversations. I have had numerous complaints on how she talks to employees during and after their training on hose beaders. Due to her performance write ups we moved her out of the area (instead of suspension) for

about a year but brought her back when we lost a few employees. I don't see her behavior changing and she has been given plenty of opportunities. I would have to say termination would be the correct outcome in my opinion. She has the documented issues and we need to make sure we let the employees know that this type of language/behavior will not be tolerated.

[Filing No. 36-1 at 21.] Ms. Gerth responded: "I am leaning towards termination as well."

[Filing No. 36-1 at 21.] Mr. Young added:

I hate to terminate anyone but in this situation we unfortunately don't have a choice. She has been given ample opportunities to improve her interactions with others and hasn't been able to do that. I cannot see a place for her that doesn't have interactions with others. I feel it would be a continuing problem going forward wherever she works.

[Filing No. 36-1 at 20.] Mr. Gill then responded: "Careful, we had same type of incident a few years back, no discipline taken. Wouldn't want to be accused of double standard." [Filing No. 36-1 at 20.]

Mr. Young testified that he did not know any specific information about Ms. Odom's alleged use of the n-word in 2011, other than that she was describing Brazil nuts on that occasion. [Filing No. 36-1 at 8.] He stated that "Barb, historically, has had communication issues with people that she has been training" and that he "heard complaints and things, it's about how she talks to them about doing that job, and she's looking over their shoulder more than they want." [Filing No. 36-1 at 9.] He further explained that "sometimes she can come across as being a little demanding or insensitive to a person's questions and/or why they're doing [the job] their certain way." [Filing No. 36-1 at 9.] Mr. Young did not recall the incident from a few years back to which Mr. Gill was referring. [Filing No. 36-1 at 10.]

Subsequent emails from Mr. Young to Ms. Gerth, Mr. Gill, and Mr. Lang reflect that Mr. Young approached Ms. Odom on October 5, 2018 to discuss the incident. [Filing No. 44-8 at 2.] According to Mr. Young's summary of the conversation, Ms. Odom was "adamant she changed

after the warning in 2011" and did not use the n-word anymore except for this one conversation with Ms. Paschall, who brought up her grandmother using the n-word to refer to white raisins. [Filing No. 44-8 at 2.] Ms. Paschall denies ever using the n-word to refer to white raisins. [Filing No. 36-2 at 13.] She also denies having a grandmother from the south. [Filing No. 36-2 at 13.] Ms. Paschall testified that Ms. Odom "used the n**ger toes joke with . . . a lot of black employees." [Filing No. 36-2 at 16.]

Mr. Young placed Ms. Odom on a three-day suspension.  [Filing No. 44-8 at 2.] Ms. Odom testified that she was surprised when she was disciplined for her comment, because she believed that the interaction "was just an innocent conversation that somebody misunderstood or misinterpreted or something." [Filing No. 36-5 at 16.] Ms. Odom admitted that she had been disciplined in the past for using the term "n**ger toes" in reference to candy, but stated that she felt comfortable using the term with Ms. Paschall because Ms. Paschall "said it first." [Filing No. 36-5 at 16-17.] Ms. Odom testified that she understood the term to refer to both Brazil nuts and to "chocolate covered cream drop[s] that you can buy around Christmastime." [Filing No. 36-5 at 17.]

Mr. Young "did some more digging" about the situation by speaking with Ms. Paschall, Mr. Ragland, Mr. Combs, Mr. Lang, and two other employees, Tracy Garner and Chris Greggory.  [Filing No. 44-8 at 1-2.] According to his email summary of this investigation, Ms. Paschall maintained that Ms. Odom said the n-word out of nowhere. [Filing No. 44-8 at 1.] Mr. Young also stated as follows:

> Gerald Ragland didn't provide any specific issues with Barb but did allude to us not listening to his issues with John Benash (we addressed this issue a couple of weeks ago).  He said he was just keeping busy and staying under the radar.
> Josh Combs didn't have any issues with Barb other than her directness often caught new people off guard.  He said she did talk about her boat or family

etc and things could be taken wrong. She didn't have an active filter on what she said.

Tracy Garner said Barb did tell him of the conversation about the south that she and Dawn had. He didn't hear it but said the issues stemmed from that conversation only. He had no issues with Barb other than her directness and she is an asset to the beading area.

Chris Greggory said he has heard Barb say things like what Dawn was saying several times in the last few years. He has tried to stress as a friend about her use of offensive terms and being sensitive about who may be listening in the breakroom other than the person she was talking to.

Steve Lang said she was probably an Average to slightly above average worker – maybe as high as 75% producer. Steve said he didn't want to lose anyone either, but doesn't see the issue changing, given issues with her past. She had quality issues which have improved, but hasn't gotten along with people at times in quite a few areas. New people being trained by her have complained about their treatment and Barb constantly talking about her family or boat etc.

In summary, there is really no new compelling evidence to consider. Barb was found to be in violation of the November 2011 discussion with Steve and Chris regarding the use of sensitive words. She had one person say he has heard them recently and it appears that her word choice in other situations is problematic to new people. The question that comes up, then, is her use of sensitive words to describe an item, not a person or group of people, a terminable offense or would this 3 day suspension be enough punishment to possibly get her attention. She has shown that she is capable of improving her quality so maybe it will improve this time again.

I am leaning on allowing her to return to work after the suspension with her understanding the next offense would be termination. Her word choice was definitely insensitive, but as reference to an item, not directed at people. We can suggest or mandate her to the EAP but I am not sure if they do anything on sensitivity training.

[Filing No. 44-8 at 2.] Ms. Gerth responded that she would defer to Mr. Young's decision, but that if Ms. Odom "ever uses the word (regardless of context) in our facility it will result in immediate termination." [Filing No. 44-8 at 1.] The written document concerning Ms. Odom's suspension states:

Description of Infraction:
On September 21 or 22, Barb used an unacceptable description of Brazil Nuts of Chocolate candy using the N word to a minority employee in her department. Barb has been counciled (sic) about using that word before in a similar descriptive mannor (sic). There have also been discussions about her word choice in many undocumented discussions with Josh, Steve and others.

15

Plan for Improvement:
You must never use this word in the facility again in any context. There is also a
need for you to work on your sensitivity and word choices when dealing with
your co-workers. You have to change to remove the stigma that your choice of
words come out without being filtered by your brain.

Consequences of Further Infractions:
Immediate termination if you ever use the N word in any context. Also, if you are
not successful in changing your communication style, you may be removed from
training others and placed somewhere else in the plant.

[Filing No. 44-13 at 1.] Ms. Paschall testified that she never heard Ms. Odom use the n-word

after she was suspended. [Filing No. 36-2 at 15.]

In addition to the incident described above, Ms. Paschall testified that Ms. Odom would

refer to Ms. Paschall and Mr. Ragland as "you guys" and repeatedly tell them to get back to

work, even if they were already working. [Filing No. 36-2 at 11-12; *see also* Filing No. 36-2 at

11 (stating that Ms. Odom would clap her hands and say "y'all need to bust this up" if Ms.

Paschall and Mr. Ragland were talking).] Ms. Paschall testified that Ms. Odom gave her and Mr.

Ragland the jobs that she did not want to do herself. [Filing No. 36-2 at 13; Filing No. 36-2 at

15.] Ms. Paschall described Ms. Odom as "a hateful person to work for," but noted that Ms.

Odom was "really nice to" white employees. [Filing No. 36-2 at 13.] Ms. Paschall also stated

that, after Ms. Odom returned to work, Ms. Paschall "was uncomfortable working in the same

department with her and felt that the employees in the bending department were hostile to [her]

because [she] complained." [Filing No. 44-1 at 3.]

## F.  Ms. Paschall's Other Allegations of Racism

Ms. Paschall testified that she and Mr. Ragland were not given overtime after making

complaints about harassment. [Filing No. 36-2 at 23.] She stated that the "leads" continued to

work overtime, but she and Mr. Ragland, as the only "regular" employees in the department, no

longer had the opportunity to do so. [Filing No. 36-2 at 24.]

16

Ms. Paschall also testified that one employee wore a confederate flag t-shirt to work, and the next day management prohibited wearing such shirts in the workplace but employees continued to wear them.  [Filing No. 36-2 at 18.]  Ms. Paschall stated that employees also wore apparel with the slogan "Make America Great Again," which she believed was racist.  [Filing No. 36-2 at 24-25.]  However, Ms. Paschall did not complain about this apparel to anyone. [Filing No. 36-2 at 18.]

Mr. Paschall reported to Mr. Young that she was uncomfortable working in the end forming/bending department with Ms. Odom, so Mr. Young offered to take Ms. Paschall to the brazing department to meet the supervisor and to discuss a possible transfer to brazing.  [Filing No. 36-2 at 19; Filing No. 44-1 at 3.]  According to Ms. Paschall, the brazing supervisor, who was a white male, refused to shake her hand and "looked at [her] hand like it was a disease." [Filing No. 36-2 at 19; Filing No. 44-1 at 3.]  Ms. Paschall felt like she was not wanted in the brazing department.  [Filing No. 44-1 at 3.]

The next day, Ms. Paschall quit her job at Tube Processing.  [Filing No. 44-1 at 3.]  She testified that she left her job because "it was very, very, very racist, and it was just like it was 1954 in there."  [Filing No. 36-2 at 18.]  Ms. Paschall testified that she did not complain to management about any incidents of harassment besides the incidents with Mr. Benash and Ms. Odom.  [Filing No. 36-2 at 19.]

### G.  Mr. Ragland's Allegations of Racism

In his declaration, Mr. Ragland states that "[t]houghout [his] time at Tube Processing, [he] felt like [he] was being treated differently than [his] white co-employees."  [Filing No. 44-2 at 1.]  Specifically, he stated that "[w]hite employees directed [his] work assignments and offered [him] assignments that had lower chances for bonuses and advancement," and "[w]hite

employees asked [him] to do harder jobs than other white employees." [Filing No. 44-2 at 1.]
Mr. Ragland stated that "[i]t appeared to [him] that there was a group of white employees who
essentially ran the shop and that [he] was used by them for their own personal advancement."
[Filing No. 44-2 at 2.]   He "believed that they were racist and showed it by wearing 'Make
America Great Again' clothing and confederate flag apparel."   [Filing No. 44-2 at 2.]   Mr.
Ragland stated that he "complained multiple times about discriminatory assignments, the lack of
advancement and the lack of raises based on [his] exclusion for being black" and eventually
resigned in November 2018 "[d]ue to the racial hostility." [Filing No. 44-2 at 2.]

In his deposition, Mr. Ragland testified that some Tube Processing employees referred to
themselves as "the Good Old Boys" or the "Good Old Boys Gang." [Filing No. 36-6 at 36-37.]
He stated:

> I guess Josh's dad used to work there or something so all these people
> were in cahoots with each other, because they talk about going to Steve Lang's
> house and going fishing and all this crazy stuff.  And I just take it in and listen.
> And I just feel like -- I don't -- I can't explain -- I can't pinpoint exactly if
> they was being racially towards me, or not -- prohibiting me from doing things or
> any of that nature.  But I don't know what the good Old Boys Gang and all that
> stuff is.

[Filing No. 36-6 at 36-37.] Mr. Ragland never complained to management or human resources
about this issue, because he "thought it was better just to shut up." [Filing No. 36-6 ay 37.]

Mr. Ragland believed that white employees were treated better than Black employees and
Black employees were required to do harder jobs than white employees. [Filing No. 36-6 at 37.]
Mr. Ragland testified that he complained about this to management, including Mr. Combs, Mr.
Lang, and Mr. Young. [Filing No. 36-6 at 37-38.] Mr. Combs acknowledged that Mr. Ragland
complained that Ms. Odom was doing the easier jobs while Mr. Ragland had to do harder jobs.
[Filing No. 36-3 at 10.] According to Mr. Combs, he assigned jobs to the team daily and Ms.

Odom did not have the ability to assign jobs or claim jobs before other people.  [Filing No. 36-3 at 10.]

Mr. Ragland also testified that he complained to Mr. Combs, Mr. Lang, and Mr. Young about getting difficult jobs and was "begging" them to give him a new position when another employee retired.  [Filing No. 36-6 at 35.]  When asked which new position he wanted to bid for, Mr. Ragland responded: "Who knows, who was about to retire at that time, or --."  [Filing No. 36-6 at 35.]  Mr. Ragland stated that management never posted jobs to go through the bidding process, but he had "just seen people go to that position," although he could not identify any employee that got a new position outside of the bidding process.  [Filing No. 36-6 at 5.]

Mr. Ragland testified that he observed other temporary employees, including a white woman, get hired as permanent employees more quickly than he did, but he could not provide their names or any other details about their situations.  [Filing No. 36-6 at 38-39; *see also* Filing No. 36-2 at 29 (Ms. Paschall stating in her deposition that some white employees "worked there for like two weeks" before being hired permanently, but stating that she did not know any of their names.)]  Mr. Sanders, however, was hired directly by Tube Processing and was never a temporary employee.  [Filing No. 36-4 at 2.]  Mr. Combs was a temporary employee for one year before being permanently hired, [Filing No. 36-3 at 2], and Ms. Odom was a temporary employee for just over eight months, [Filing No. 36-5 at 2].

Mr. Ragland testified that he was continually "harassed" for wearing a hoodie at work, while other employees would wear hoodies and hats with no consequences.  [Filing No. 36-6 at 11-12.]  Mr. Ragland recalls that hoodies were prohibited because Tube Processing did not want employees to be able to conceal headphones inside their hoods, but he believes that rule was enacted because he was the only person that wore a hoodie and he wore one every day.  [Filing

No. 36-6 at 12.]  He stated that, despite knowing that hoodies were against the dress code, he continued to wear one and continued to be the only person to do so. [Filing No. 36-6 at 12.]  He also admitted to placing a phone charger wire inside his hood to make it look like he was wearing headphones so that management would be tricked into reprimanding him.  [Filing No. 36-6 at 49-50; Filing No. 36-6 at 112.]

Tube Processing has a policy prohibiting employees from wearing headphones or earbuds for safety reasons. [Filing No. 36-3 at 6.]  Mr. Combs testified that he approached Mr. Ragland on several occasions and asked him if he was wearing headphones, because Mr. Ragland was wearing a hoodie with the hood up and other employees reported seeing him with headphones. [Filing No. 36-3 at 6.]  Mr. Combs testified that he sometimes did catch Mr. Ragland wearing headphones, but he also caught numerous others wearing headphones and reminded them that headphones were not permitted. [Filing No. 36-3 at 7; Filing No. 36-3 at 14.]  Mr. Combs stated that both white and Black employees were verbally, informally reprimanded for wearing headphones on the job.  [Filing No. 36-3 at 14.]  Mr. Combs acknowledged that Mr. Ragland believed that he was being singled out due to his race. [Filing No. 36-3 at 6-7.]  Mr. Ragland testified that he felt singled out when he was reprimanded for wearing a hoodie, because other white employees wore visible ear buds and were not reprimanded. [Filing No. 36-6 at 33-34.] However, Mr. Ragland recorded a conversation that he had with another Black employee, Pat Tunstill, during which Mr. Ragland indicated that he wished to file a claim with the Equal Employment Opportunity Commission regarding racial discrimination, to which Mr. Tunstill responded, "you can't say it's discrimination because they ain't fucking with us." [Filing No. 36-6 at 50; Filing No. 36-6 at 112.]  When asked about this in his deposition, Mr. Ragland agreed that Mr. Tunstill meant that he and other Black employees were not facing the same treatment as

Mr. Ragland, and therefore Mr. Ragland's treatment was likely not racially motivated. [Filing No. 36-6 at 50.] Mr. Ragland also admitted that it was possible that he was being singled out due to his bipolar disorder, or for some other reason. [Filing No. 36-6 at 50.]

Mr. Ragland testified that Mr. Combs once accused him of stealing. [Filing No. 36-6 at 30.] However, he could not identify anything to suggest that he was accused because of his race. [See Filing No. 36-6 at 31 ("Q: But there was nothing in that situation that suggested that he was picking on you because of your race as opposed to some other reason; right? A: Right.").] Mr. Combs testified that he was looking for a missing lock and he approached everyone in the department to ask whether they had seen it. [Filing No. 36-3 at 7.] Mr. Combs testified that he knew Mr. Ragland believed that he was asked about the missing lock because he is Black, but Mr. Combs denied that was the case. [Filing No. 36-3 at 7.]

Mr. Combs testified that Mr. Ragland "was kind of a practical joker" and "would just do little things." [Filing No. 36-3 at 13.] According to Mr. Combs, other employees "would kind of just tattle on him about the little things." [Filing No. 36-3 at 13.] For example, Mr. Ragland "brought in a fishing pole one day," attached money to the end of the line, and tried to get people to chase the money while he reeled in the line. [Filing No. 36-3 at 13.] Mr. Combs also recalled one incident where Mr. Ragland "took the microwave and plugged it up on a cart and had, like, a full Thanksgiving dinner there on his workstation." [Filing No. 36-3 at 13.] Other employees complained because food generally was not allowed in the workspace. [Filing No. 36-3 at 13.]

During his time at Tube Processing, Mr. Ragland received various verbal warnings and disciplinary write-ups, including for: using an electronic vapor cigarette, [Filing No. 36-6 at 80-81], using inappropriate language with coworkers, [Filing No. 36-6 at 81], violating the attendance policy, [Filing No. 36-6 at 82; Filing No. 36-6 at 85], not properly following

directions for work-related tasks, [Filing No. 36-6 at 87], using his cell phone on company time, [Filing No. 36-6 at 92], engaging in horseplay, [Filing No. 36-6 at 93-94], and threatening a coworker, [Filing No. 36-6 at 94].[1]  Mr. Ragland also received a written evaluation indicating that his production was too low, but he disagrees with that evaluation because he believes his actual production numbers were higher than reported.  [Filing No. 36-6 at 19-20.]

Mr. Ragland also testified that white employees wore apparel with Confederate flags or the slogan "Make America Great Again."  [Filing No. 36-6 at 42-43.]  An email conversation between Walter Brooks, Phil Pryor, Tammy Owen, Clyde Griffith, Wayne Skidmore, Mr. Lang, Mr. Gill, and Ms. Gerth in October 2018 confirms that at least one employee, Larry Cardwell, wore "a Trump shirt" in the bending department.  [Filing No. 44-9 at 1-3.]  Mr. Cardwell was asked "not to wear clothes that could be interpreted as political." [Filing No. 44-9 at 2.]  During that conversation, Mr. Lang opined that the employee handbook requires only that "a shirt comes to the waist, the pants come down to the ankle and there is no profanity or drug related writing or pictures on the clothes," so that is the clothing standard he was planning to enforce unless instructed differently.  [Filing No. 44-9 at 2.]  Mr. Griffith opined that he was "hearing and seeing so much animosity between several employee's (sic)" at the Madison Building, noting that "[i]t appears that any situation is being construed to include White privilege and or prejudice against people of race," and "[a]rticles of clothing with Trump on them are taken offensively." [Filing No. 44-9 at 1.]  Mr. Griffith "recommend[ed] someone [in human resources] get involved as quickly as they can and start investigating what can get changed to assist." [Filing No. 44-9 at

---

[1] Ms. Odom testified during her deposition that Mr. Ragland's behavior towards her was "harassing."  [Filing No. 36-5 at 7-9.]  She stated that he would follow her around and continuously ask her to meet him after work and sometimes would verbally accost her.  [Filing No. 36-5 at 7-8.]  Ms. Odom testified that she complained to Mr. Combs and Mr. Lang, but nothing was done.  [Filing No. 36-5 at 9.]

1.] Ms. Gerth responded that she would speak with Mr. Young to "come up with a game plan," because "[t]here is obviously a bigger issue at play here that has nothing to do with [the] employee apparel policy." [Filing No. 44-9 at 1.]

On November 21, 2018, Mr. Ragland submitted his resignation letter indicating that his last day of work would be December 1, 2018. [Filing No. 36-6 at 25.] On November 29, 2018, Tube Processing decided to end Mr. Ragland's employment and directed him to leave. [Filing No. 36-6 at 26.] On his way to clear out his toolbox, Mr. Ragland approached Mr. Sanders to speak with him, at which point Mr. Lang told Mr. Ragland to stop hindering production, and the two got into a verbal altercation. [Filing No. 36-6 at 26.] Mr. Ragland was paid through December 1, 2018, but Mr. Lang noted in an email that there was "[d]efinitely no rehire possibility" after the altercation. [Filing No. 36-6 at 25-27; Filing No. 36-6 at 98.] Mr. Ragland signed a form indicating that he resigned from his position, [Filing No. 36-6 at 100], but he maintains that he was terminated despite having signed that form, [Filing No. 36-6 at 27-28].

**H.  Other Employees' Perceptions of the Environment at Tube Processing**

Mr. Sanders testified that he worked overtime often and was never denied overtime. [Filing No. 36-4 at 5; Filing No. 36-4 at 14.] He stated he "probably did the most overtime of probably anybody in that warehouse," with the exception of one other employee. [Filing No. 36-4 at 5.] Mr. Sanders explained that employees could get a $100 bonus for working a full extra shift on Saturdays, and a sign-up sheet was passed around so employees could voluntarily sign up to work. [Filing No. 36-4 at 5.] He stated there was never an instance in which he signed up but was not allowed to work. [Filing No. 36-4 at 5.]

Mr. Sanders testified that, because he had been with Tube Processing longer than any other Black employee, Ms. Paschall approached him and told him about the comments Mr.

Benash and Ms. Odom made to her.  [Filing No. 36-4 at 8.]  According to Mr. Sanders, Ms.
Odom never made any inappropriate comments to him, but he had heard about Ms. Odom telling
a Black employee "that she had a taste for some n**ger toes," although he did not personally
witness it.  [Filing No. 36-4 at 8.]  Mr. Sanders stated that the few Black employees at Tube
Processing felt frustrated and that management was overlooking Ms. Odom's behavior.  [Filing
No. 36-4 at 9.]  Mr. Sanders confronted Mr. Lang to ask what was being done about Ms. Odom's
comment and express his opinion that racism should not be permitted in the workplace.  [Filing
No. 36-4 at 9.]  Mr. Sanders believed that it was unfair that Ms. Odom was only suspended for
three days.  [Filing No. 36-4 at 10.]  Mr. Sanders added that, after the incident with Ms. Odom,
Tube Processing "had somebody come over and talk about discrimination, how to properly use
words," although he did not attend the meeting because he was on vacation.  [Filing No. 36-4 at
11.]

Ms. Sanders testified that he has observed racial hostility at Tube Processing, including
people telling him to "shut the fuck up."  [Filing No. 36-4 at 11-12; Filing No. 36-4 at 16.]  He
stated that management never did anything about this hostility.  [Filing No. 36-4 at 12.]  Mr.
Sanders testified that he felt singled out and felt as if he was treated differently than white
employees and he was aware of other employees' complaints of racism.  [Filing No. 36-4 at 12.]
However, Mr. Sanders never personally observed either Mr. Ragland, Ms. Paschall, or any other
employee being subjected to racially discriminatory treatment.  [Filing No. 36-4 at 12.]

Angela Phillips, a Black woman, worked at Tube Processing from November 2017 until
February 2020.  [Filing No. 44-11 at 1.]  She stated that when she worked in the bending
department, she "experienced racism and sexism from [her] co-workers."  [Filing No. 44-11 at
1.]  According to Ms. Phillips, Ms. Odom was "very vocal and made inappropriate comments"

24

and also "liked to control the area she worked in and claimed authority" over other workers. [Filing No. 44-11 at 1-2.] Ms. Phillips stated that Ms. Odom told her that she went to Decatur High School and Ms. Phillips responded that her husband had been in the first group of students that had been bussed there to integrate the school, to which Ms. Odom responded, "he was one of the reasons we moved." [Filing No. 44-11 at 1-2.]

Ms. Phillips also stated that she was sexually harassed by Mr. Benash, who she described as "abusive and hostile" and "a big showboat and so arrogant that he appeared to [her] to act like he could get away with anything." [Filing No. 44-11 at 2.] Ms. Phillips said that "Benash had asked [her] if [she] was a 'squirter' which referred to how [she] experienced sex." [Filing No. 44-11 at 2.] According to Ms. Phillips, she complained about Mr. Benash to Mr. Combs and Mr. Lang and they "blew it off." [Filing No. 44-11 at 2.] She stated that after she complained, Mr. Benash "began making [her] life hell" and she was moved to the brazing department. [Filing No. 44-11 at 2.] Mr. Combs recalls a period of time where employees were "angry with each other" because of "something between John [Benash] and Angela." [Filing No. 36-3 at 9.]

According to Ms. Phillips, Mr. Ragland arranged a meeting between her and Ms. Paschall at a gas station. [Filing No. 44-11 at 2.] At the meeting, the women discussed their harassment and Ms. Phillips "knew [Ms. Paschall] was not lying because Benash did the same thing to [her]." [Filing No. 44-11 at 2.]

After Ms. Paschall left Tube Processing, Mr. Benash was out on medical leave, but when he returned, Ms. Phillips demanded that she be allowed to file a harassment complaint against him. [Filing No. 44-11 at 2.] Ms. Phillips eventually met with Ms. Gerth, who said "it was a shock to her that the conduct of Benash had been going on." [Filing No. 44-11 at 3.] Ms. Phillips stated that Mr. Lang and Mr. Young never acted on her complaints, except for moving

Case 1:19-cv-04488-JMS-MG   Document 52   Filed 04/13/21   Page 26 of 52 PageID #: 830

her around to different departments. [Filing No. 44-11 at 3.] She said that the bending department was concerned with employee production "and Benash produced." [Filing No. 44-11 at 3.] According to Ms. Phillips, Tube Processing conducted a three- or four-week investigation of her complaints, Mr. Lang resigned, and Mr. Benash went out on medical leave for a second time. [Filing No. 44-11 at 3.] When Tracy Garner became the new supervisor of the department, he "made it clear that he did not want [Ms. Phillips] there," so she resigned. [Filing No. 44-11 at 3.] Ms. Phillips has filed a complaint with the Equal Employment Opportunity Commission. [Filing No. 44-11 at 3.]

### III.
### DISCUSSION

**A.  Ms. Paschall's Sexual Harassment Claim**

*1.  Tube Processing's Objection to Ms. Paschall's Declaration*

As a preliminary matter, the Court notes that in its reply brief, Tube Processing argues that the Court should disregard the portions of Ms. Paschall's declaration addressing her sexual harassment claim because the declaration improperly contradicts and embellishes the allegations made in her deposition testimony. [Filing No. 48 at 5-6.] Specifically, Tube Processing argues that Ms. Paschall's description in her declaration of Mr. Benash's conduct—which states that Mr. Benash asked if she "squirted" during sex and asked "how [her] vagina looked since [she] was Black and he was white"—is "much more vulgar and explicit" than the description in her deposition testimony, which reflects that Mr. Benash asked her if she "swerved" but did not mention the term "squirted" or the word "vagina." [Filing No. 48 at 5.]

In their surreply, Plaintiffs argue that Ms. Paschall's declaration is admissible because it merely clarifies—rather than contradicts—her deposition testimony. [Filing No. 49 at 2.] Plaintiffs assert that "it is clear [from the deposition transcript] that what the court reporter

26

transcribed as 'swerve' is actually 'squirt'" and the declaration is necessary to correct this transcription error.  [Filing No. 49 at 2.]  Plaintiffs also argue that, although Ms. Paschall never expressly mentioned the word "vagina" in her deposition, it was clear from the context that in her testimony when Mr. Benash said, "How does it look," "it" was referring to her vagina.  [Filing No. 49 at 3-4.]

"The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims," and Rule 56 requires the Court "to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (citations omitted).  To that end, "the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *Id.* at 316 (citation omitted).  The rationale for this rule is simple: "a *genuine* issue of material fact cannot be conjured out of nothing." *Id.* (emphasis in original).  However, there are three notable exceptions to the rule, and a court may rely upon a supplemental affidavit that contradicts prior testimony if: (1) the affidavit is based on newly discovered evidence; (2) the prior testimony is demonstrably mistaken; or (3) the affidavit clarifies ambiguous or confusing deposition testimony. *Id.* at 317; *see also Howell v. Smith*, 853 F.3d 892, 900 (7th Cir. 2017) ("Although a party may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits, [c]ourts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation—e.g., confusion, mistake or lapse in memory—for the discrepancy." (internal quotations and citations omitted) (alteration in original)).

27

After comparing both of Ms. Paschall's descriptions of Mr. Benash's conduct, the Court finds that her deposition and declaration are not inconsistent. Tube Processing does not offer any suggestion as to what the term "swerved" could mean in this context, and the Court accepts Plaintiffs' assertion that it was a transcription error.[2] In addition, it is abundantly clear that when Ms. Paschall explained in her deposition that Mr. Benash asked her "How does it look," "it" was referring to her vagina. Again, Tube Processing does not offer any other plausible suggestion concerning what Ms. Paschall's deposition testimony might mean if it was in fact inconsistent with her declaration. Absent any such suggestions, Tube Processing's argument that the declaration is inadmissible is disingenuous at best. Accordingly, the Court will consider Ms. Paschall's declaration in its entirety in addressing the merits of her claim.

### 2. *Merits of the Claim*

Tube Processing accepts for purposes of its summary judgment motion that Mr. Benash engaged in the behavior that Ms. Paschall alleges and that she complained about such behavior to Mr. Combs and eventually Mr. Young. [Filing No. 37 at 38.] However, Tube Processing asserts that Mr. Benash's behavior is insufficient to support a claim for hostile work environment because Mr. Benash was not Ms. Paschall's supervisor and because there was only one isolated incident of verbal harassment, which was not so severe or pervasive as to create a hostile work environment. [Filing No. 37 at 38-39.] Tube Processing also asserts that there is no basis for employer liability for Mr. Benash's behavior because Tube Processing promptly and effectively addressed the issue by disciplining Mr. Benash after Ms. Paschall complained. [Filing No. 37 at 39.]

---

[2] Ms. Paschall's deposition is unsigned, so it is unclear whether she or her counsel ever reviewed the transcript for accuracy. [*See* Filing No. 36-2 at 32; Filing No. 44-4 at 33-34.]

In response, Plaintiffs argue that Tube Processing "fails to consider the offensiveness and egregiousness of the conduct that began almost immediately after [Ms.] Paschall began work." [Filing No. 43 at 29.]  Plaintiffs assert that the fact that Mr. Benash was training Ms. Pashcall and she believed him to be a supervisor renders his comments more abusive, and this "air of 'apparent authority' allowed [Mr.] Benash to have power over [Ms.] Paschall and made it impossible for her to 'tell the offender where to go.'" [Filing No. 43 at 29-30 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 801 (1998)).] Plaintiffs assert that Mr. Benash's comments to Ms. Paschall were "absolutely abhorrent" and "Title VII does not allow people to talk like that in the workplace." [Filing No. 43 at 30.] Plaintiffs also argue that "it is the subjective effect on [Ms.] Paschall that determines hostility," and that Tube Processing acknowledges that Mr. Benash's behavior left Ms. Paschall crying and needing to take a break before returning to work. [Filing No. 43 at 30.]  Plaintiffs also argue that whether Ms. Paschall was constructively discharged as a result of the harassment is for a jury to decide. [filing No. 43 at 35.]  Plaintiffs contend that "[t]here is ample evidence that the Defendant did not exercise sufficient control over its workplace to protect its employees from harassment." [Filing No. 43 at 33.] Specifically, Plaintiffs assert that Mr. Benash was permitted to sexually harass Ms. Paschall and Ms. Phillips and his disciplinary record makes no mention of sexual harassment. [Filing No. 43 at 33.] According to Plaintiffs, Mr. Young and Mr. Lang attempted to minimize Mr. Benash's conduct and did not disclose any disciplinary measures to Mr. Ragland or Ms. Paschall. [Filing No. 43 at 34.] Plaintiffs assert that "[w]hen Young and Lang engaged in this obfuscation, minimization, and, frankly, deceit, they were acting in the scope of their employment" and as such, Tube Processing should be held vicariously liable for their conduct. [Filing No. 43 at 34-35.]

In reply, Tube Processing maintains that Ms. Paschall's allegations concerning Mr. Benash are insufficient as a matter of law to create a hostile work environment based on sex, and Plaintiffs' response brief focuses on whether Tube Processing punished Mr. Benash harshly enough but does nothing to demonstrate severe or pervasive sexual harassment. [Filing No. 48 at 6.] Tube Processing asserts that Plaintiffs ignore the undisputed evidence showing that Mr. Benash was disciplined for his conduct, and such discipline was sufficient to prevent future harm whether or not Plaintiffs were aware of the discipline. [Filing No. 48 at 9.] Tube Processing argues that "there is simply no evidence," beyond Plaintiffs' conclusory assertions, that Tube Processing ignored or minimized Ms. Paschall's complaints, the evidence shows that Tube Processing implemented remedial measures to limit Ms. Paschall's interaction with Mr. Benash while investigating, and Ms. Paschall had no other incidents of harassment with Mr. Benash either before or after his discipline. [Filing No. 48 at 9.] In Tube Processing's view, "[t]hese facts are simply fatal" to Ms. Paschall's claim. [Filing No. 48 at 9.] Tube Processing further argues that "Plaintiffs' attempt to make [Mr.] Benash into some quasi-supervisory figure to enhance the severity of the sole incident they allege fails as a matter of fact and logic" because Mr. Benash does not fit the legal definition of a supervisor and "had so little actual power" that when he said something improper, Ms. Paschall was free to complain, did complain, and never had to work with or be trained by Mr. Benash again. [Filing No. 48 at 12.]

"Hostile or abusive work environments are forms of sex discrimination actionable under Title VII of the Civil Rights Act of 1964." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986). To establish a hostile work environment based on sex, a plaintiff must show that: (1) she was subjected to unwelcome sexual conduct, advances, or requests; (2) the conduct was because of her sex; (3) the conduct was

severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Lapka*, 517 F.3d at 982 (citation omitted). "These elements are evaluated in light of the 'particular facts and circumstances' of the case." *Id.* (citation omitted).

Regarding the third element, a plaintiff must demonstrate that the harassment she experienced was "severe or pervasive" enough to create an abusive environment and to alter the conditions of her employment. *Id.* at 983 (citing *Meritor*, 477 U.S. at 67). This element has both a subjective and an objective component, meaning the plaintiff must subjectively perceive the work environment as hostile and it also must be objectively hostile to a reasonable person. *Lapka*, 517 F.3d at 983. The Seventh Circuit has "repeatedly stressed that the phrase 'severe or pervasive' is disjunctive," and "even one act of harassment will suffice if it is egregious." *Id.* (internal quotations and citations omitted). Although "[d]etermining whether behavior crosses that threshold is not subject to 'a mathematically precise test,'" in order to "be severe or pervasive enough to create a hostile work environment, conduct must be 'extreme.'" *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). A court must consider all the relevant circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Costco Wholesale Corp.*, 903 F.3d at 625 (citing *Harris*, 510 U.S. at 23).

The fourth element—whether there is a basis for employer liability—depends on whether the harasser is the victim's supervisor or co-employee. *Parkins v. Civ. Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). "When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its

liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (citing *Parkins*, 163 F.3d at 1032). "The employer is liable for a hostile work environment created by the employee's coworkers, however, only when the employee shows that his employer has 'been negligent either in discovering or remedying the harassment.'" *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (quoting *Parkins* 163 F.3d at 1032). "An employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment of its employees.'" *Parkins* 163 F.3d at 1032.

Although Title VII does not define the term "supervisor," the Seventh Circuit has said that "the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Id.* at 1033. The caselaw has distinguished "between low-level supervisors who were the equivalent of co-workers and supervisors whose authority and power was sufficient to make consequential employment decisions affecting the subordinate." *Id.* "[T]he essence of supervisory status is the authority to affect the terms and conditions of the victim's employment, [which] primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* at 1034. "Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer." *Id.*; *see also Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) ("We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (citation omitted)).

"The law of [this] circuit supports Title VII's goals by holding an employer liable under Title VII's negligence standard if it 'failed to discover and prevent' sexual harassment of an employee giving rise to a hostile work environment." *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006) (citations omitted).  In addition, an employer "can be held liable for [an employee's] harassment if it 'unreasonably fail[ed] to take appropriate corrective action . . . reasonably likely to prevent the misconduct from recurring.'  The emphasis is on the prevention of future harassment." *Lapka*, 517 F.3d at 984 (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990)) (alterations in original).  "Of course, the 'hallmark of a reasonable corrective action' is a prompt investigation." *Lapka*, 517 F.3d at 984 (quoting *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 953-54 (7th Cir. 2005)).  "[T]he question is not whether the punishment was proportionate to [the harasser's] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000).  Separating the harasser and the victim is generally sufficient to prevent future harassment. *See id.* (citing cases).

"In order to show that a hostile work environment resulted in her constructive discharge, [a plaintiff] must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that her resignation was an appropriate response." *McPherson*, 379 F.3d at 440 (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004)).  "The 'working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because . . . an employee is expected to remain employed while seeking redress.'" *McPherson*, 379 F.3d at 440 (quoting *Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003)) (alteration in original).

Tube Processing does not expressly dispute that Mr. Benash's comments to Ms. Paschall constitute unwelcome sexual conduct or advances based on sex.  [*See* Filing No. 37 at 38-39.] Regardless, given the nature of the comments, the Court concludes that the first two elements of a hostile work environment claim based on sexual harassment are met.  *See Onacle v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) ("Courts and juries have found the inference of discrimination [based on sex] easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex."); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (referring to harassment as "hostile, intimidating, or degrading behavior," that is either "verbal or nonverbal").  Ms. Paschall has not, however, satisfied the third and fourth elements of her claim.

Mr. Benash's inappropriate sexual comments—while disgusting and undoubtedly inappropriate—represent an isolated incident that was not so severe as to create an objectively hostile work environment.  Although Ms. Paschall was subjectively upset by the comments to the point that she was crying, contrary to Plaintiffs' argument, Ms. Paschall's subjective perception is not dispositive.  Conduct must also be objectively severe, *see Lapka*, 517 F.3d at 983, and in this instance the Court concludes that Mr. Benash's comments on one single occasion, which did not include physical contact, threats, or intimidation, are not egregious enough to create a hostile work environment based on sex as a matter of law.  *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (concluding that "teasing about waving at squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or

buttocks" were not sufficiently severe or pervasive); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 528 (7th Cir. 1993) (concluding that two incidents of harassment by a supervisor—one in which he touched the victim's leg repeatedly and kissed her without consent, and one in which he "'lurched' at her from behind some bushes, as if to grab her"—were not sufficiently severe or pervasive to create a hostile work environment); *Enriquez v. U.S. Cellular Corp.*, 2008 WL 4925012, at *10 (N.D. Ill. Nov. 14, 2008) (concluding that no objectively hostile environment work existed where, among other things, a coworker "asked [the victim] to lie across his desk while wearing lingerie, told her that she has a nice body, that her pants looked 'good on her ass,' and that her 'tits are going to look nice' in her new [work] uniform"). *Cf. Alalade v. AWS Assistance Corp.*, 796 F. Supp. 2d 936, 937 (N.D. Ind. 2011) (concluding that one incident of sexual assault "was easily severe enough to be actionable"). Because the evidence is insufficient to demonstrate a hostile work environment, it is also insufficient to sustain a claim for constructive discharge. *See McPherson*, 379 F.3d at 440.

In addition, Ms. Paschall has not demonstrated any basis for employer liability. There is no evidence that Mr. Benash had the authority to hire, fire, demote, promote, transfer, or discipline an employee or make any other kind of decision that impacted Ms. Paschall's employment benefits, and therefore he does not constitute a supervisor for Title VII purposes. *See Vance*, 570 U.S. at 431; *Parkins* 163 F.3d at 1034. Plaintiffs acknowledge as much in their response. [*See* Filing No. 43 at 30 (acknowledging that Mr. Benash was "not a supervisor on the organizational chart of Tube Processing").] It may be true that Mr. Benash was charged with training new employees and that Ms. Paschall believed that those duties gave him some sort of authority, but the legal standard for declaring a person a supervisor requires more. Indeed, the fact that Ms. Paschall immediately complained about Mr. Benash's conduct undermines her

assertion that he had some sort of supervisory power that prevented her from raising her concerns about his behavior.

Furthermore, Plaintiffs have not presented evidence from which a reasonable factfinder could conclude that Tube Processing was negligent in preventing future harassment. Ms. Paschall was moved to a different task, away from Mr. Benash, after reporting his comments, which is ordinarily sufficient to prevent future harassment. *See Tutman*, 209 F.3d at 1049. Ms. Paschall did not have any other interactions with, and was not subjected to any further inappropriate comments by, Mr. Benash after Tube Processing reprimanded him. The fact that Ms. Paschall was not aware of any discipline, or that the disciplinary write-up did not specifically mention sexual harassment, is irrelevant. Ms. Paschall "would have preferred a different result but the emphasis of Title VII in this context is not on redress but on the prevention of future harm." *Lapka*, 517 F.3d at 984. Plaintiffs provide no factual support for their assertion that Mr. Lang and Mr. Young engaged in "obfuscation, minimization, and, frankly, deceit" related to Ms. Paschall's complaint, and, in any event, Plaintiffs offer no legal support for their position that such behavior creates a basis for employer liability absent any showing of recurring harassment or negligence.

Finally, Plaintiffs' argument that "Title VII does not allow people to talk like that in the workplace," [Filing No. 43 at 30], is simply a misstatement of the law. The Court agrees that people should not behave like Mr. Benash did in the workplace, but Title VII is not a "general civility code" and will not create liability for "the sporadic use of abusive language, gender-related jokes, [or] occasional teasing." *Faragher*, 524 U.S. 775 at 788 (citation omitted). Although Mr. Benash's comments are rude and offensive, Tube Processing is not liable for them

36

under Title VII for the reasons described above, and therefore Tube Processing's Motion for Summary Judgment is **GRANTED** as to Ms. Paschall's sexual harassment claim.

### B. Mr. Ragland's and Ms. Paschall's Racial Harassment Claims

Tube Processing argues that Mr. Ragland's claim fails as a matter of law because he "offers a shotgun approach to his allegations," which are based on his subjective perceptions of racism and are disproven by undisputed factual evidence. [Filing No. 37 at 31.] Tube Processing acknowledges that Mr. Ragland is a member of a protected class for purposes of § 1981 and Title VII, [Filing No. 37 at 5], but argues that he has not produced evidence suggesting that any alleged harassment or mistreatment was based on his race, [Filing No. 37 at 31-36]. Specifically, Tube Processing contends that with respect to the alleged harassment related to wearing a hoodie, Mr. Ragland admitted that Tube Processing was concerned about people wearing earbuds for safety reasons, acknowledged that Tube Processing never punished Mr. Ragland for wearing a hoodie, and could provide no examples of other individuals who were treated better after wearing a hoodie. [Filing No. 37 at 31.] Tube Processing also asserts that Mr. Tunstill's comment captured on one of Mr. Ragland's surreptitious recordings—"you can't say it's discrimination because they ain't fucking with us"—demonstrates that the alleged harassment related to hoodies is unconnected to race. [Filing No. 37 at 31-32 (citing Filing No. 36-6 at 50; Filing No. 36-6 at 112).] Tube Processing argues that there is no evidence that the incident concerning the stolen lock was related to Mr. Ragland's race and Mr. Combs testified that he asked everyone—regardless of race—about the lock. [Filing No. 37 at 32.] Tube Processing also asserts that Mr. Ragland has provided no evidence supporting his allegation that his production was higher than reported or that he was disciplined for his lack of production. [Filing No. 37 at 32.] In addition, Tube Processing contends that Mr. Ragland produced no

evidence to support his claim that he waited longer than white employees to become a full-time employee, and that he actually waited the same or a shorter amount of time than Ms. Odom and Mr. Combs, while Mr. Sanders waited no time at all. [Filing No. 37 at 32-33.] According to Tube Processing, Mr. Ragland's reference to a "Good Old Boys Gang" is similarly unsupported, as he failed to provide evidence about any job postings he did not get to see. [Filing No. 37 at 33.] Tube Processing makes similar arguments regarding Mr. Ragland's claims about the lack of overtime and extra pay or the attendance point system, pointing out that Mr. Ragland did not produce any evidence about discriminatory treatment and that Mr. Sanders and Ms. Paschall never had similar problems. [Filing No. 37 at 33-34.] Tube Processing argues that the allegations that other employees wore offensive clothing are "insufficient to demonstrate that anyone was motivated by racism or that it created a hostile working environment as a matter of law." [Filing No. 37 at 34.] Tube Processing contends that Mr. Ragland's failure to produce any evidence other than his own subjective beliefs—coupled with the fact that he was aware of the company's process for handling discrimination complaints yet never availed himself of that process—entitles it to summary judgment. [Filing No. 37 at 35.] Finally, Tube Processing argues that there is no evidence that Mr. Ragland was subject to a hostile work environment, harassed because of his race, or constructively discharged, and "if anything, because [Mr.] Ragland's practical joking, foul language, and confrontational style with others went overlooked on numerous occasions, it is arguable that [Mr.] Ragland received more favorable treatment and a longer leash than he deserved." [Filing No. 37 at 36.]

Tube Processing also argues that Ms. Paschall's hostile work environment claim based on race fails for the same reasons that Mr. Ragland's claim fails: her allegations are based on her own subjective perception of racism and are disproven by undisputed factual evidence. [Filing

No. 37 at 36.]  According to Tube Processing, the following occurrences are not "objectively about race": (1) Ms. Odom referring to Ms. Paschall and Mr. Ragland collectively as "you guys" or avoid doing difficult jobs; (2) the Shelby Street supervisor's refusal to shake Ms. Paschall's hand; and (3) other employees wearing apparel featuring the confederate flag or the slogan "Make America Great Again."  [Filing No. 37 at 37.]  Tube Processing contends that there is no evidentiary support for Ms. Paschall's "naked allegations" that she was denied the opportunity to work overtime on Saturdays or that white employees became full-time employees more quickly than Black employees, and in fact that undisputed evidence shows that these allegations are false.  [Filing No. 37 at 37.]  Finally, Tube Processing asserts that there is evidence disproving Ms. Paschall's allegation that each department can have only one Black employee, and regardless, there is nothing tying that allegation to harassment or unequal terms of employment.  [Filing No. 37-38.]  As for Ms. Odom's use of the n-word, Tube Processing accepts Ms. Paschall's version of events for purposes of this motion, but argues that the claim fails as a matter of law because it is limited to one instance of verbal harassment and Tube Processing promptly addressed and remedied the problem when it received notice.  [Filing No. 37 at 39-40.]  Similarly, Tube Processing asserts that Mr. Benash's alleged use of the n-word is insufficient, because even combined with Ms. Odom's conduct, is not so severe or pervasive to alter the conditions of employment.  [Filing No. 37 at 40-41.]  Tube Processing asserts that neither of the alleged comments was directed at Ms. Paschall, and therefore they are insufficient to demonstrate a hostile work environment.  [Filing No. 37 at 41.]

In response, Plaintiffs argue that Mr. Ragland was "singled out for disparate treatment constantly" and had observed the treatment of Ms. Paschall and Ms. Phillips, and the cumulative effect of all of his experiences and observations created a hostile work environment.  [Filing No.

43 at 32-33.] Plaintiffs argue that because the "common denominator" between Mr. Ragland, Ms. Paschall, and Ms. Phillips was their race, a jury is needed to determine whether it is reasonable to infer that their treatment was racially motivated. [Filing No. 43 at 33.]

Regarding Ms. Odom's comments to Ms. Paschall, Plaintiffs argue that "being confronted with a white employee saying n**ger after being viciously sexually harassed" would surely affect a reasonable person the same way it affected Ms. Paschall. [Filing No. 43 at 30.] Plaintiffs argue that courts have recognized that the use of the n-word can create hostility, and that Mr. Sanders' testimony supports such a conclusion in this case. [Filing No. 43 at 30-32 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Rodgers v. W.-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993); *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984)).] Plaintiffs argue that "every black person in this case" testified that Ms. Odom "crossed a serious line," and after she was not dealt with severely by the company—despite having a history of similar behavior—Ms. Paschall and Mr. Ragland quit and Mr. Sanders decided to have no more dealings with human resources. [Filing No. 43 at 32.] According to Plaintiffs, "[t]his is the prototypical change in workplace conditions that *Meritor* and the race harassment cases teach us is actionable under Title VII and Section 1981." [Filing No. 43 at 32.] Plaintiffs assert that Mr. Young and Mr. Lang attempted to minimize the seriousness of Ms. Odom's conduct and given the warnings Ms. Odom received years earlier, Tube Processing was on notice that "she was a continuing problem to make racial comments." [Filing No. 43 at 34.] Plaintiffs further state that "[i]f negligence is the standard, perhaps a good analog is the 'one free bite' rule for negligence in pet ownership; the first bite is free (Odom's racist comment in 2011) but after that Tube Processing was responsible for her actions in the workplace." [Filing No. 43 at 34.] According to Plaintiffs, Tube Processing "fail[ed] to act until a valued black employee went to the plant

supervisor and complained," and if Mr. Sanders had never done so, Ms. Odom would have received no discipline. [Filing No. 43 at 33.] Finally, Plaintiffs argue that whether the harassment led to Plaintiffs' constructive discharge is a question that a jury should decide. [Filing No. 43 at 35.]

In reply, Tube Processing asserts that "Plaintiffs have come nowhere close to setting forth a claim of severe or pervasive harassment as required under well-established applicable case law." [Filing No. 48 at 2.] It argues that Mr. Ragland's allegations that he was singled out or mistreated are conclusory and lack evidentiary support, and he cannot rely on his own subjective belief and speculation that the alleged mistreatment was racially motivated in order to overcome summary judgment. [Filing No. 48 at 3-4.] According to Tube Processing, "[t]he Court must accept the facts as set forth by [Tube Processing] on [Mr.] Ragland's allegations because they are supported by admissible evidence, and Plaintiffs have failed to rebut those facts with any admissible evidence to the contrary." [Filing No. 48 at 4.] Tube Processing contends that the Court should "disregard much of [Ms.] Paschall's allegations and claims on summary judgment for the same reason, as her perceptions and feelings about what she experienced at [Tube Processing] and the environment at [Tube Processing] have no evidentiary support either." [Filing No. 48 at 4-5.] In addition, Tube Processing argues that Plaintiffs' attempt "to speak on behalf of all 'Black employees' through one witness, Ben Sanders," is improper because: (1) Mr. Sanders can only speak for himself; and (2) Mr. Sanders did not purport to testify on behalf of all Black employees and mentioned in his deposition that other Black employees ignored the situation with Ms. Odom or Mr. Sanders was not aware of their perspective on the issue. [Filing No. 48 at 6-7.] Tube Processing asserts that there is no evidence supporting Plaintiffs' claim that Ms. Odom was only disciplined because Mr. Sanders confronted Mr. Lang, since the unrebutted

evidence shows that Mr. Young was investigating the incident and discussing options with management.  [Filing No. 48 at 7-8.]  Tube Processing also argues that the discipline of Ms. Odom was effective because no further racial epithets were used after the discipline occurred.  [Filing No. 48 at 8.]  Tube Processing argues that the fact that it took disciplinary measures that prevented future harassment is "simply fatal" to Plaintiffs' claims.  [Filing No. 48 at 9.]  In sum, Tube Processing argues, Plaintiffs' conclusory allegations are insufficient to create genuine issues of material fact and Plaintiffs' claims fails as a matter of law.  [Filing No. 48 at 10-12.]

"Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).  "To prove a claim for hostile work environment based on race, an employee must show that: '(1) he [or she] was subject to unwelcome harassment; (2) the harassment was based on his [or her] race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.'" *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 895-96 (7th Cir. 2016).  Claims under Title VII and § 1981 are analyzed in the same manner, and therefore caselaw addressing one type of claim applies to both types. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).[3]

Regarding the second element, "the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." *Yancick*, 653 F.3d at 544.  "Although a connection between the harassment and the plaintiff's protected class

---

[3] The *Yancick* Court applied a slightly different version of the hostile work environment standard.  *See* 653 F.3d at 544 (listing the elements as: "(1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability").  The Seventh Circuit later clarified that despite minor differences in wording, these two inquiries are in essence the same.  *Cole*, 838 F.3d at 896 n.6.

need not be explicit, 'there must be some connection, for "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority."'" *Cole*, 838 F.3d at 896 (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014)).  "[F]orms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status." *Cole*, 838 F.3d at 896 (citations omitted).  "Whether the inference is appropriate depends on the circumstances of the case; if so, the superficially neutral events are properly considered as part of 'the entire context of the workplace.'" *Id.* at 897 (citation omitted).

More evidence than a plaintiff's subjective beliefs is required to survive summary judgment on the issue of whether a harasser's conduct is racially motivated.  *See Yancick*, 653 F.3d at 548 ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." (quoting *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006)).

In addition, general complaints that people of a certain race are treated less favorably than others do not support a hostile work environment claim.  In *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004), the plaintiff, who alleged a racially hostile environment, generally complained that African-Americans were treated "more harshly," were asked to change rail ties more frequently, worked longer sections of the track, and were written up for reasons that whites were not.  However, the plaintiff did not provide specific examples of this treatment, such as "any of the times, dates or places which led to these conclusions." *Id.*  The Court observed that "Rule 56 demands something more specific than the bald assertion of the general

truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted," and concluded that "without specific instances of support, we cannot consider [the plaintiffs'] assertions in support of his hostile work environment claim." *Id.*

As for the third element of a hostile work environment claim, courts generally "will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yancick,* 653 F.3d at 544 (citation omitted). Courts "do not focus on discrete acts of individual employees when evaluating a hostile work environment claim, but must consider the entire context of the workplace." *Id.*; *see also EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 626 (7th Cir. 2018) (explaining that "[c]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive," but instead must "determine whether a workplace was hostile based on 'all the circumstances' of the case"). However, "[o]ne instance of conduct that is sufficiently severe may be enough." *Cole,* 838 F.3d at 897 (quoting *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007)).

"[I]ncidents directed at others and not the plaintiff . . . do have some relevance in demonstrating the existence of a hostile work environment." *Yancick,* 653 F.3d at 545 (quoting *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir.1999)) (alteration in original). "[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace." *Yancick,* 653 F.3d at 545 (citation omitted); *see also Yuknis v. First Student, Inc.*, 481 F.3d 552, 555-56 (7th Cir. 2007) ("Offense based purely on hearsay or rumor really is 'second hand'; it is less credible, and, for that reason and also because it is less confrontational, it is less wounding than

offense based on hearing or seeing . . . ; and it is also more difficult for the employer to control. The American workplace would be a seething cauldron if workers could with impunity pepper their employer and eventually the EEOC and the courts with complaints of being offended by remarks and behaviors unrelated to the complainant except for his having overheard, or heard of, them.").

With regard to racial epithets, courts must consider the frequency of their use, whether they were used by a supervisor versus a co-equal employee, "as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271-72 (7th Cir. 2004) (concluding that remarks made by a supervisor over ten years prior, which were not heard directly by the plaintiff, were insufficient to demonstrate a hostile work environment). "One utterance [of an epithet] alone does not create an objectively hostile work environment." *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004)

Many of Mr. Ragland's and Ms. Paschall's allegations of mistreatment are insufficient to support their hostile work environment claims for the reasons the Seventh Circuit recognized in *Lucas*. Specifically, although Plaintiffs assert that they had to do harder jobs than white employees, they were not allowed to bid for other jobs, they were denied overtime or opportunities for bonuses, they had to work as temporary employees longer than others did, or they were just generally treated more harshly than white employees, they do not provide sufficient evidence to support these assertions. Plaintiffs point to no evidence or specific instances of white employees doing easier jobs, do not identify which jobs were harder or occasions on which they were forced to complete such jobs, cannot identify any jobs they were not permitted to bid on or any people who received jobs outside of the bidding process, have not

stated any specific instances when they were denied overtime or bonuses to which they were entitled, nor have they named any employees who were hired as permanent employees outside the ordinary timeframe.  These evidentiary gaps are especially glaring given that Tube Processing's uncontradicted evidence demonstrates that another Black employee, Mr. Sanders, was never denied overtime and never worked as a temporary employee, while white employees including Ms. Odom and Mr. Combs worked as temporary employees for the same time or for longer than Mr. Ragland.  Accordingly, these unsupported assertions do not aid Plaintiffs in establishing that they were subject to a hostile work environment.  *See Lucas*, 367 F.3d at 726.

In addition, Plaintiffs do not offer much in the way of evidence, aside from their own subjective beliefs, to demonstrate that some of their treatment was racially motivated.  For example, Mr. Ragland believes that he was singled out for wearing a hoodie, but offers no evidence that he was targeted because of his race.  Indeed, Mr. Ragland acknowledges that hoodies were prohibited and he was the only person who wore a hoodie, [Filing No. 36-6 at 12], Mr. Tunstill, another Black employee, was not targeted and therefore did not believe that Mr. Ragland's treatment was a result of his race, [Filing No. 36-6 at 50; Filing No. 36-6 at 112], and Mr. Ragland testified that it was possible that he was being singled out due to his bipolar disorder, or for some other reason, [Filing No. 36-6 at 50].  Mr. Ragland points to no evidence from which a reasonable factfinder could conclude that he was singled out regarding hoodies as a result of his race.  Similarly, Ms. Paschall can point to no evidence that the brazing supervisor's refusal to shake her hand was a racially motivated slight.

As for Ms. Paschall, the remaining occurrences that could support her hostile work environment claim are: Mr. Benash's use of the n-word; Ms. Odom's use of the n-word, comment about opposing school integration, and reference to Ms. Paschall and Mr. Ragland collectively as

"you guys"; and other employees wearing apparel depicting the confederate flag or bearing the slogan "Make America Great Again" or other references in support of former President Donald Trump.

Of this conduct, the use of the n-word is especially troubling to the Court, which has previously addressed the term as follows:

> "[T]he word 'n\*\*ger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). As a sister court in this Circuit recognized—thirty-six years ago—this word "automatically separates the person addressed from every non-black person." *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984). Indeed, the word "was created to divest people of their humanity." *Iconoclasts: Maya Angelou* (Sundance Channel Nov. 30, 2006). Put mildly, "the word 'n\*\*ger' can have a highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). "There is no better proof of its enduring toxicity than the fact that, in polite society, it is spoken and written only in its euphemistic shorthand—'the n-word'—than its full, spelled-out form." Dave Sheinin & Krissah Thompson, *Redefining the Word: Examining a Racial Slur Entrenched in American Vernacular That is More Prevalent than Ever*, WASH. POST (Nov. 9, 2014). As then-Judge Kavanaugh noted—citing everything from Langston Hughes' autobiography *The Big Sea*, to Harper Lee's *To Kill a Mockingbird*, to Alex Haley's *Roots*—"[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (opining that a single use of the word by a supervisor should generate liability). In short, "[t]here is no other word like it in the English language, encompassing [ ] the ugliest sort of hate." Sheinin & Thompson, supra.

*Scaife v. U.S. Dep't of Veterans Affs.*, 2020 WL 7028042, at *7 (S.D. Ind. Nov. 30, 2020). Even so, there is caselaw indicating that one or two uses of that deplorable word—when used by coworkers rather than a supervisor—is not so severe as to create an objectively hostile work environment. *See Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 640 (7th Cir. 2019) (stating that summary judgment in favor of the employer would be appropriate "[i]f the only evidence of racial harassment [the plaintiff] had was a co-worker's [as opposed to a supervisor's] use of the three epithets"); *Scaife*, 2020 WL 7028042, at *7 (observing that "under

the binding precedent of this Circuit, a single expression of the awful term does not constitute a hostile work environment under Title VII"). *Cf. Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) (concluding that a reasonable jury could find that a hostile work environment exited where an employee "was *repeatedly* subjected to hearing the word" (emphasis added)).

The Court acknowledges that the use of the n-word and Ms. Odom's other comments were rude and offensive, but these utterances, even when considered in combination with the other complained of conduct, are not objectively severe or pervasive enough as a matter of law to sustain hostile work environment claims under Title VII or § 1981. The comments were made near the beginning of Ms. Paschall's employment, and did not recur throughout her remaining several weeks at Tube Processing. Mr. Benash's remark was not directed at Ms. Paschall, and Ms. Odom's use of an epithet was referring to a food item, rather than a person or a group. Although these circumstances do not make the use of the n-word acceptable, they do lessen the abusive impact for purposes of the hostile work environment analysis. *Dandy*, 388 F.3d at 271-72; *Yancick*, 653 F.3d at 545. As for the apparel worn by other employees, the Seventh Circuit has recognized that "displays of confederate flags in the workplace may support a hostile work environment claim," *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011), but no such authority appears to exist in reference to "Make America Great Again" or related political apparel. Plaintiffs provide no specific evidence concerning the frequency or manner in which the confederate flag apparel was worn and therefore leave the potential factfinder with nothing from which to conclude that such apparel was pervasive enough to contribute to an objectively hostile work environment. *See Ellis*, 650 F.3d at 648 (concluding that two incidents of an employee wearing confederate flag clothing plus one offensive comment was insufficiently

48

severe to support a hostile work environment claim).  For the same reasons, the evidence is insufficient to sustain a claim for constructive discharge.[4]  *See McPherson*, 379 F.3d at 440.

Regardless, Ms. Paschall has not demonstrated a basis for employer liability.  Ms. Paschall acknowledges that she only complained to management about Ms. Odom's use of the n-word and about Mr. Benash's behavior.  Both Mr. Benash and Ms. Odom were reprimanded about how they spoke to their coworkers, and Ms. Odom was suspended for three days and warned that if she ever used racially inappropriate language again, she would be terminated.  "To avoid liability, the employer must respond in a manner reasonably likely to end the harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011).  The Court concludes that Tube Processing's actions were reasonably likely to prevent future harassment, and they did in fact do so.

Plaintiffs argue that Tube Processing should be held to a higher standard because Ms. Odom had previously been in trouble in 2011 for using the n-word.  But the Seventh Circuit has explained that an "employer [is] not liable for an instance of severe harassment merely because the employer had notice of 'one prior incident which may or may not rise to the level of actionable harassment and which was not ignored by the employer.'" *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011) (citing *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379 (7th Cir. 2002)).  In *Sutherland*, the employer was on notice that a male employee was

---

[4] The Court arrives at this conclusion by following, as it must, binding precedent establishing and applying the standard for what constitutes an objectively hostile work environment based on race.  In light of recent events and the continuing movement to reevaluate and redefine societal standards of acceptable behavior, recognize the harms caused by racial hostilities and microaggressions, and encourage tolerance and acceptance, it may well be time to revisit the legal requirements for what an individual must endure before his or her work environment can be deemed objectively hostile as a matter of law.  This Court, however, is not empowered to conduct such an inquiry or to alter those requirements, and instead must apply them as they currently exist.

"leering at [a female employee] and asking personal questions," and then gave her a gift card. 632 F.3d at 992. Years later, the same male employee sexually assaulted another female employee and gave her an inappropriate holiday card. *Id.* The Court concluded that the employer's actions relative to the assault—reprimanding the harasser, limiting the overlap between the harasser's and the victim's schedules, and reassigning the victim to work in a different location when the victim and the harasser were scheduled to work in the same department—were reasonably likely to prevent future harassment. *Id.* at 995. The Court expressly rejected the plaintiff's argument that the prior complaint should have caused the employer to punish the harasser more severely or to take different remedial measures. *Id.*

The same result is required here for Ms. Paschall's claim. Not only did Tube Processing discipline Ms. Odom and Mr. Benash for their conduct, but it also offered to transfer Ms. Paschall to another department, which would have resulted in her being physically separated from both of them. *See Sutherland*, 632 F.3d at 995 ("[I]n some circumstances, creating physical separation and minimizing time worked together are steps reasonably likely to end harassment."). In addition, Ms. Paschall never complained about her coworkers' confederate flag apparel, offered no evidence that Tube Processing was on notice of such apparel, and acknowledged that that sort of clothing was prohibited by Tube Processing's policy. [Filing No. 36-2 at 18.] An employer generally may only be found negligent if it fails to take appropriate remedial measures once apprised of the harassment, but "the law does not consider an employer to be apprised of the harassment 'unless the employee makes a concerted effort to inform the employer that a problem exists.'" *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (citations omitted).

Mr. Ragland's claim is similarly deficient. He did not personally witness Mr. Benash's use of the n-word or any of Ms. Odom's conduct, but merely heard of those instances secondhand. *See Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("There is no hostile work environment where as here, the harassment about which [the plaintiff] complains was not directed at her."). And again, there is no evidence concerning the confederate flag apparel to suggest it was pervasive or created an abusive environment. Finally, Mr. Ragland did not complain to management or human resources regarding any of these matters.

For all of the foregoing reasons, Tube Processing's Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims for hostile work environment based on race.

## IV.
### CONCLUSION

As the Seventh Circuit has made clear, "summary judgment 'is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (*Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). The Court certainly does not condone any of the conduct at issue in this lawsuit, but for the reasons articulated in this Order, Plaintiffs have not produced sufficient evidence from which a reasonable factfinder could conclude that Plaintiffs satisfied all of the elements of their claims that they were subject to a hostile work environment or constructively discharged based on sex or race. Tube Processing's Motion for Summary Judgment, [35], is therefore **GRANTED**. Final judgment shall issue accordingly. Plaintiffs' Agreed Motion for Continuance of Final Pretrial Conference and Jury Trial, [51], is **DENIED AS MOOT**.

Date: 4/13/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**